UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HEZEKIAH EDWARDS,<br><br>　　　　Petitioner,<br><br>　v.<br><br>J SOTO, et al.,<br><br>　　　　Respondents. | Case No. 14-cv-05622-WHO<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

## INTRODUCTION

Petitioner Hezekiah Edwards ("petitioner") seeks federal habeas relief from several state convictions alleging (1) there was insufficient evidence as to his conviction for the Antioch murder and attempted murder; (2) his conviction for the Antioch murder and attempted murder was unlawfully based on the uncorroborated testimony of an accomplice, Manika Dunn; and (3) his conviction for the murder of Aberial Bradley was also unlawfully based on the uncorroborated testimony of accomplice Dunn. None of these claims has merit and, for the reasons set forth below, the petition for habeas relief is DENIED.

## BACKGROUND

Petitioner is a California state prisoner serving a sentence of life imprisonment without the possibility of parole. Petitioner was found guilty by jury for (1) the murder of Willie Lavall, Jr., Cal. Penal Code § 187(a)-count one; (2) the attempted murder of John Denton, Cal. Penal Code §§ 664, 187(a)- count two; and (3) the murder of Aberial Bradley, Cal. Penal Code § 187(a)-count three. The California Court of Appeal affirmed the conviction on June 27, 2013. The California Supreme Court denied review on October 2, 2013. This federal habeas petition followed.

The California Court of Appeal summarized the facts in its June 27, 2013 unpublished

opinion:

*The Antioch murder and attempted murder*

On March 24, 2006, Willie Lavall, Jr. was killed outside an apartment complex in Antioch where defendant Edwards's mother lived. At the time of the killing Lavall was accompanied by Johnny Denton, who was also shot but survived.

At approximately 4:30 p.m., Lavall and Denton, whose girlfriend lived in the apartment complex, were in the parking lot putting new license plates on Denton's car when a light green van pulled into the lot. Two African American men with guns got out of the van. One man pointed his gun at Lavall, and the other pointed his at Denton's face. The men told Denton and Lavall to get into the van, which was stopped some five to ten feet away. The assailants pushed Lavall and Denton toward the van. As they neared the van, Denton could see a third person in the driver's seat but could only say it was an African American; he could not tell if it was a man or a woman, nor could he judge height, body build, or facial features. There were no seats in the van behind the front seat.

Lavall took off running and was gunned down by one of the two assailants. He fell in front of the van. A nearby resident and the apartment manager heard three gunshots and called 911.

Denton also ran and disappeared around a dumpster, then heard Lavall screaming, and started to go back. He then realized he had been shot in the arm and sat down, fearing loss of blood.

Police recovered two casings at the crime scene. A slug was also pulled out of Lavall's chest. Later ballistics testing would show that both casings recovered were fired from one nine-millimeter gun.

Based on Lavall's condition, location, and drag marks in the area, it was determined that the van ran over him after he was on the ground and dragged him into the street, where he was found by a neighbor. One leg was folded under him in a contorted manner which made it appear he had only one leg; his shoes had been dragged off his feet.[2] There was road rash on his stomach, chest, face, and arms. Lavall told police he had been shot while trying to run away from a vehicle.

Lavall's bullet wound was not fatal, as the bullet lodged just under the skin of his chest. He was taken to the hospital, where he suffered cardiac arrest and died. His cause of death was determined to be blunt force trauma due to the dragging.

Neither Lavall nor Denton had any idea who their assailants were. Denton described the man who held the gun on him as being five feet eight inches tall, approximately 160 pounds, wearing a black hoodie and a knit cap known as a beanie, having dreadlocks or little twisties sticking out from under the beanie, with a little moustache. He told a police officer that his assailant had gold teeth on both the top and bottom. The apartment manager, who also saw the two gunmen in the parking lot from a distance of 180 feet, described both as being younger, slender African Americans, five feet ten to

2

six feet tall, one with a lighter complexion than the other. He was unable to identify either of the gunmen from photo lineups.

According to Denton, the man who accosted Lavall was more heavy-set, but the apartment manager thought they were both of a similar slighter build. Denton described the second gunman as being a Black male adult, 23 years old, five feet ten inches tall, 250 pounds, with dreadlocks or twisties sticking out from underneath his hat.

Despite the similarity in Denton's description of the second gunman's build,[3] the prosecutor's theory was that Johnson and a second man wielded the guns while Edwards drove the van, evidently because Edwards did not match the description given by the apartment manager. The second gunman was never identified. There was no significant description of the driver other than that he or she was an African American whose complexion had a "little color."

Two months after the murder, Denton was shown four six-photo arrays and picked Johnson alone out of those lineups, expressing 80 percent certainty Johnson was the man who held the gun on him.[4] He was equally sure at the preliminary examination. Denton based his identification on Johnson's facial features, particularly his eyes and moustache. He was somewhat hesitant to identify Johnson as the gunman during the photo lineup because Johnson had short hair and did not have dreadlocks or twisties in the photo. The officer told him to imagine the man in the photograph with a different hairstyle, and Denton then picked Johnson. At trial four years after the crimes, Denton identified Johnson to a 60 percent or 70 percent level of certainty.[5]

Johnson, an African American, was five feet eight inches tall, 150 pounds, and 24 years old at the time of his arrest. He did not have dreadlocks or twisties in his hair, and it was stipulated that his hairstyle in March 2006 was the same short style as that pictured in the photo lineup. However, the lead investigator on the Oakland murder case testified it is common for criminals to disguise their appearance and it is easy to change the appearance of one's hair. Although Johnson lived in Oakland, Johnson's cell phone records show he was in Antioch at the time of the shooting, as was Edwards, and it may be inferred they traveled there together from Oakland.[6]

The initial police broadcast described the van as silver or cream-colored, occupied by three Black men. Shortly after intercepting that broadcast on his police scanner, a pizza delivery driver on Forty–Niner Way in Antioch saw three black men in their late teens or early twenties standing in a driveway across the street from a light green van. The van was parked headed in the wrong direction on the street. One Black man, described as five feet eight inches tall, with short hair, and 160–165 pounds, then ran across the street and jumped into the van and took off. After the van pulled out it made an abrupt U-turn.

The delivery driver wrote down the license plate. When a later police broadcast described the van used in the murder as light green,

3

he called the police and gave them the license number. He was unable to identify either defendant as the man he saw jump into the van, but he said Johnson's build, complexion, and hairstyle were similar to those of the man he saw.

*The van*

The van proved to be the murder weapon. The license number matched one that had been rented from the Fox Rent–a–Car agency (Fox) at the Oakland airport. The police searched the van at Fox on March 27. They discovered blood, tissue, and fiber on the undercarriage. Testing of the blood showed it was Lavall's. The van had back seats, but they were removable. The police impounded the van.

According to Fox's records, the van had been rented in the name of Aberial (April) Bradley, but there was evidence that Edwards had been involved. The rental agent, Katrina Fritz,[7] had met both co-defendants previously through her boyfriend, David Bell.[8] Fritz sometimes rented vehicles to Edwards at a good rate because he was a friend of Bell's. Fritz also knew Edwards's girlfriend, Manika "Meka" Dunn.

Testifying as part of a plea agreement,[9] Dunn recounted her involvement with Bradley and Edwards in renting and returning the van used in the Lavall murder. Edwards and Dunn could not rent a car in their own names because neither had a valid driver's license or credit card. Bradley agreed to sign for the rental car because she was a friend of Edwards's mother and was a second mother figure to Edwards. Fritz did not know Bradley outside of the rental transaction, but Dunn and Bradley had become friends through Dunn's dating relationship with Edwards.

On February 14, 2006, Bradley had come to Fox rental agency with Edwards and Dunn and rented a Toyota Sienna van in her name. Although Bradley drove the van out of the rental lot, Edwards took over driving immediately afterwards. That van was traded in for a Mazda van on March 7, which in turn was returned and another Toyota Sienna (the murder van) was rented by Bradley on March 15. On that date Bradley and Dunn alone conducted the transaction with Fritz; Edwards was not there. Edwards and Dunn, however, shared use of the van through the rental period. Fritz confirmed that she had seen Edwards driving one of the rented Siennas with Dunn as a passenger. Around this same time, Edwards bought an Oldsmobile Aurora.

One evening in March 2006 (inferably the night of Lavall's murder), Edwards called Dunn while she was staying at a house on Brookdale Avenue in Oakland with Yushica Skipper, whom she referred to as her sister (though they were not biologically related). Dunn had an apartment in Antioch which she shared with Edwards, but she often stayed at Skipper's house because it was closer to where she worked.

During the phone call, Edwards asked if anyone in the house had a driver's license. Dunn said a friend named Tenisha had a license. Edwards asked if Dunn and Tenisha could come with him to help

4

him pick up the rented van in Antioch. Dunn agreed. Cell phone records show Dunn and Edwards spoke several times that evening, including at 9:17 p.m. when they were both in Oakland.

Edwards arrived in his car and picked up the two women and drove them to Antioch.[10] Dunn's cell phone records confirm she was in Antioch at 10:54 p.m., and Edwards's cell phone records show he was in Pittsburg at 10:29 p.m. and in Antioch at 10:44 p.m. Dunn drove the van back to Oakland from Antioch while Tenisha drove back to Oakland in Edwards's car, following Dunn, with Edwards as a passenger. When Dunn stopped the van at a Safeway store parking lot to close the rear door, Edwards scolded her, saying, "Man, I told you, this van is hot."

At Edwards's direction, Dunn parked the van in East Oakland somewhere in the vicinity of 73rd Avenue. After they parked the van, Edwards then drove her and Tenisha back to Skipper's house on Brookdale. Edwards's cell phone records confirm he was back in Oakland again from 11:50 p.m. until 1:01 a.m. Later that evening, Dunn and Edwards went back to their apartment in Antioch.

Later that night or the next morning Dunn heard Edwards talking on the phone, saying he had been hanging out smoking in the parking lot of his mother's apartment complex when "some shit happened" and "some nigga got shot and some nigga got ran over." Dunn later read in the newspaper about Lavall's murder and knew that was what Edwards had been talking about.

On March 25, Dunn and Edwards picked up the van, filled it with gas, and Dunn alone returned it to Fox. The windshield was cracked and there was damage to the rear passenger door. Dunn told Fritz the van had been in an accident the day before. Dunn filled out a damage form, signing Bradley's name. Fritz knew she was not Bradley, but she took the van back into inventory and processed the damage paperwork. When the police later questioned Fritz about who returned the van, she described Dunn but did not admit knowing her.

*The Oakland murder*

When the police removed the van from the rental yard on March 27, someone at Fox called Fritz and told her that the police had been there, had found blood on the undercarriage, had impounded the van, and wanted to talk to her. Fritz then passed that information on to Bell.

Cell phone records showed a 14–minute call made from one of Fritz's phones to Edwards's phone at 11:41 p.m. on March 27. Fritz denied calling Edwards that night, but testified that Bell might have called Edwards using her cell phone. During the call she heard Bell say that "something had gone down in Antioch." The prosecutor theorized that during this call the decision was made that Bradley must be killed. On the night of March 27 Edwards also called Dunn at Skipper's house, as corroborated by cell phone records, and told her the police had picked up the rental van.

Edwards called Dunn at Skipper's house the next evening (March

5

28) and told her to come outside.[11] When she did Edwards was waiting in his Oldsmobile Aurora with Johnson as a passenger. Edwards told Dunn if she wanted to pick up any fresh clothes for work from their apartment in Antioch she should take BART to the Pittsburg station where he had arranged for Bradley to pick her up and take her to get her clothes.

Edwards and Johnson dropped Dunn at the Fruitvale BART station. Johnson expressed some doubt about whether Dunn should go to Pittsburg, saying to Edwards, "You sure you want to let her go, bro?" and "You sure, bro? Don't send her." But Edwards said it would be "good" or "cool" and gave Dunn money for the BART fare.

Cell phone records confirm Dunn left Oakland for Pittsburg shortly before 6:30 p.m. She made or received calls at 6:31 (near Rockridge BART), while traveling through Orinda at 6:39, in Walnut Creek at 6:49, and she connected to a cell tower in Pittsburg at 7:08 p.m., when she called Edwards.

Bradley was waiting at the Pittsburg station with her nine-year-old son when Dunn arrived. Dunn wanted to retrieve her clothes in Antioch, but Bradley said they had to go meet Edwards. Edwards also called Dunn, either on the way to Pittsburg or after she had arrived there, and told her to come back to Oakland with Bradley and meet him at a designated gas station on Seminary Avenue. He told her to "pull around back" behind the station.

On the way back to Oakland, Dunn received text messages from Edwards reminding her to meet him behind the gas station and saying he thought Bradley was "going to get down on us about the van" and "it's out of [his] hands." He also told her to "be on point," which she called "his favorite word." The text messages were later erased and were not available at trial. Cell phone records are consistent with both Dunn and Bradley traveling from Pittsburg to Oakland between 7:14 p.m. and 7:46 p.m. and further show that Dunn and Edwards had multiple phone conversations between 6:39 p.m. and 7:56 p.m. In one of the later conversations, Edwards told Dunn, "If something happens, get out of there."

Dunn concluded that Bradley was in danger and did not want anything to happen to her in front of her son. She told Bradley to go to Skipper's house instead of the gas station and, after talking to Edwards's mother, Renée Gray, on the phone, told Bradley to go home and handle matters with Edwards another day. Bradley left Skipper's house and took her son to his father's house in Berkeley.

Shortly after Bradley left, Edwards called Dunn.[12] When he found out Dunn was not bringing Bradley to the gas station he was angry and hung up. He soon called back and told Dunn to call Bradley and have her come back to Skipper's house. Dunn complied out of fear. She then had several phone conversations with Edwards's mother, hoping Gray could put a stop to Edwards's plans. Cell phone records confirm calls made by Dunn to Gray at 8:23 p.m., 8:37 p.m., and 8:43 p.m. Dunn and Edwards talked several times between 8:21 and 8:59; by 8:53 Edwards's phone was accessing a cell tower near

6

Skipper's house.

When Bradley returned to Skipper's neighborhood at approximately 9:00 p.m., she was not sure which house was Skipper's. She called Dunn and asked her to come outside so she could locate the house. Cell phone records show Bradley called Dunn at 8:56 p.m. and made one final call to her at 9:01 p.m.

Dunn went outside and got into the front passenger seat of Bradley's car, leaving the car door open and her feet outside the car. She asked Bradley to lend her her cell phone as a pretext to get the phone away from Bradley so the police would not find it.

Dunn saw a man she had never seen before walking across the street, approaching from behind Bradley's car. It was not Johnson. He was African American, five feet eight inches tall, wearing dark clothes, a hoodie, and a beanie. The man walked up to the passenger side of Bradley's car and asked Dunn, "Hey, little mama, what's your name?" Dunn jumped out of the car and ran back to Skipper's house.

The man shot Bradley six times, including four times in the head. He used a silver handgun. Bradley's car rolled forward, crashing into a utility pole. At 9:05 p.m. the 911 call came in regarding Bradley's car crash. Just at that time, Johnson's phone was also using a cell tower near Skipper's house, the same tower Edwards's and Bradley's phones had been utilizing.

The initial 911 call reported a traffic accident, but when police arrived to investigate it was clear Bradley had been shot. She was taken to a hospital where efforts to revive her were unsuccessful, and she died from the gunshot wounds. The actual shooter had not been identified at the time of trial.

Six casings were found in Bradley's car and at the scene, and a bullet slug was pulled out of the car door. Five bullets or parts of bullets were retrieved from Bradley's body.

Later that night Dunn phoned both Edwards and his mother, telling them about the shooting. Edwards did not say much in response. The next day Dunn destroyed Bradley's cell phone and threw the parts away because she did not want anyone to find out she was the last person to talk to Bradley.

*Edwards's arrest*

There were outstanding arrest warrants for both Edwards and Dunn. Suspecting they may have been involved in Bradley's death, the Oakland police were on the lookout for the two. On March 29, at 6:10 p.m., they saw Edwards on the street and stopped their patrol car. As one of the officers alighted, Edwards ran and disappeared into a house on 77th Avenue.

Just at that time Dunn was arriving at the scene in Edwards's car. Edwards called her from his cell phone to ask her what was going on outside, and she told him the house was surrounded by police. Cell phone records confirm these calls occurred at 6:16 p.m–6:17 p.m.

7

The police ordered in a SWAT team. They ultimately persuaded Edwards to come out of the house, but instead of surrendering he entered a crawl space under the house that was filled with water. Police fired tear gas into the crawl space and Edwards ultimately came out, soaking wet and muddy.

While police had Edwards in the back of a patrol car, Gray, SyreetaVines (the mother of Edwards's baby), Edwards's sister, and Dunn all approached them, trying to communicate with Edwards. The police allowed Vines to give telephone numbers to Edwards so he could call them from jail. The telephone numbers were also taken down by the arresting officer and would later be used to identify Edwards as the inmate who made calls on a jail pay phone to the phones of the women.

Dunn was arrested at the scene on an outstanding warrant and brought in for questioning. She told the police she was sitting with Bradley in her car just before she was shot and that they had been heading to the gas station on Seminary Avenue to meet Edwards so Bradley could sign "some papers." Otherwise she admitted no involvement. She was released the next day, but the police kept her cell phone.

A search of the crawl space under the house on 77th Avenue turned up a cell phone buried half a foot deep in mud. This was the phone Edwards had been using. A search of the house turned up a nine-millimeter semiautomatic pistol.

An expert criminalist testified the shell casings recovered from the Antioch and Oakland murder scenes were all fired from the same gun,[13] but it was not the pistol recovered from the house on 77th Avenue in Oakland. The murder weapon was not introduced at trial.

The rear unit of the duplex on 77th Avenue where Edwards sought refuge was rented by Bell. In the home when Edwards bolted in were Fritz and two other people, Willie Ward (a friend of Bell's) and Fritz's baby. (Bell was not at home.) About ten minutes after Edwards ran in, and before he surrendered, Fritz and Ward left the house with Fritz's baby. The two adults were put into the back of a police car and a family member came and took the baby. Fritz was released after Edwards was arrested.

Fritz testified she had two cell phones and had lent one of them to Bell. After she was released she began making calls on one of her cell phones, possibly the one that Bell had borrowed, trying to locate Bell and her baby. There were numbers on her phone's call list without names associated, apparently the phone numbers of people who had called Bell or whom he had called when he was using the phone. When she dialed one of the numbers the man on the line told her not to tell the police anything about him when they talked to her: "Keep my name out of your mouth. You don't know me." Fritz thought the voice sounded like either Edwards or Johnson, but she was not sure which. Since Edwards was in custody (and his cell phone was buried) it may be inferred that the speaker was Johnson.

8

*Edwards's phone calls from jail*

After Edwards was arrested he made a series of phone calls from jail to various parties. Sixteen recorded conversations were introduced at trial. They recorded Edwards talking on a pay phone in the jail to the numbers given to him by the women who approached the patrol car when Edwards was arrested. Many of the calls were made to Gray's phone, but other parties would be patched into a three-way call.

The prosecution's theory was that the calls—often involving improvised codes which even the parties to the conversation had trouble understanding showed that Edwards was deeply concerned about the police investigation into the Antioch and Oakland murders at a time when he was only being held on an unrelated warrant.

The calls show that Edwards arranged to have Dunn dispose of a black nine-millimeter gun.[14] The prosecutor was unsure whether this gun was used in the Antioch crimes, as both Denton and Dunn described the weapon used in the shootings in Antioch and Oakland as being chrome or silver color. It is possible, however, that the black gun was used by the second gunman in Antioch.

It was also clear from the phone calls that various people around Edwards were questioning what Dunn may have told the police, with mounting suspicion that she would "crack."[15] Edwards reminded her to "stay solid" for "the team." Edwards was also worried whether there was video footage of him at Fox, but proposed to have Fritz retrieve any such evidence.[16] He and his friends conferred on eliminating Denton as a witness (calling him "J. Jonah" and characterizing him as a "loose duck"). Edwards was concerned whether the police would find out about his "trip to Cancun" (which the prosecution theorized was a reference to the Antioch crimes and sometimes to Fox rental),[17] and whether they would be able to connect up the two crimes.[18] He constantly reminded everyone to "stay on point" for "the team." He worried about cell phone evidence. The calls also show that Johnson and Edwards spoke frequently and proclaimed their love for one another and their loyalty to "the team."

On April 1, 2006, Dunn told Edwards the police did not know the Antioch and Oakland crimes were related: they had not put all of the "pieces" together.[19] In that same call she told Edwards the police had recovered his "muddy" cell phone.[20]

Shortly after that call, Edwards called Johnson and the following dialogue was recorded:

Edwards: "Do you know they ain't even, uh ... bro, you know how the, uh, first trip we went on, to Cancun, bro?"

Johnson: "Yeah."

Edwards: "They ain't even ... they ain't even found out that trip got something to do with the trip to Mexico, bro, yet."

Johnson: "They don't know?"

Edwards: "Huh?"

Johnson: "They don't know, huh?"

Edwards: "No."

In a phone call on April 3, 2006, Vines told Edwards she was "stressed" because there was "so much evidence." The "manager" in Antioch had been "talking" and said he saw "three people," "two darks and one light." She told Edwards "they traced the van ... to the girl, and um, when they got to her, she was, you know." Edwards said, "Yeah."

The call recorded on April 5, 2006, was a fairly clear discussion about killing Dunn to eliminate her as a witness. Johnson told Edwards that he and some associates—identified by nicknames—got together and talked about "survive shit" and "they ain't gonna just get off this shit." Dunn, he suggested, could even cause problems "two or three years from now" and could "end up getting grabbed and cracking later on."

Edwards tried to argue she should not be killed, talking about the "loss" he had just taken "for the team," an apparent reference to Bradley's death. Johnson expressed doubt that Dunn would take a long prison sentence and stay loyal to Edwards (i.e., "what bitch you know that's, that solid out here bro?").

Edwards at one point said he was "putting it in [his] brother's hands...." Johnson told him, "it ain't really just your call right now ... 'cause it's kind of ugly right now." Johnson said "the team thinking about keeping this shit gangster." They were trying to buy a "car" needed for "this kind of situation"—which the prosecutor interpreted as a gun—and that was "the only problem last night." Johnson said they were "moving fast" " 'cause we ain't got no time to be wasting." "[W]e ain't got time to be worried about no feelings." Johnson later said, "We didn't even need to let last night go by man, that's how serious this" is.

As Edwards continued to resist, Johnson advised him to "rap with Mo" Skinner, a fellow jail inmate awaiting trial for a double murder. Two witnesses in Skinner's case had been murdered while he was awaiting trial. Johnson predicted that Skinner would tell Edwards he "don't know what you mean about witnesses."

On April 14, Oakland police warned Dunn they had intercepted calls which were threatening to her and suggested she take it seriously. Dunn initially still failed to identify Johnson in a photo lineup, but she eventually admitted she knew him as "Koont" and picked out his photo. From then on she changed the way she related to Johnson because she "did not want to end up dead." She left town as often as possible and tried to stay away from Oakland and Antioch.

But Dunn was also still loyal to Edwards. She told him after the interview that the police were recording the phone calls and they must stop talking on the phone. The last recorded phone call in

10

evidence was one to Edwards's mother on the night of April 7, 2006. Gray told Edwards that the police had some "pictures" of "the rentals" and were getting ready to "snatch Meka up" and question her "about the rentals."

Edwards was transferred to a different facility in connection with his unrelated matter and was arrested on August 3, 2006, for the crimes in this case. Johnson was arrested on July 20, 2006, when he was hospitalized with a gunshot wound. Dunn was arrested on August 1, 2006, at her place of work. Fritz was arrested in November 2007 on a murder warrant but was never charged.

*The proceedings below*

Edwards and Johnson both were charged with murder of Lavall and attempted murder of Denton, with a special circumstance allegation of murder in a kidnap attempt. In connection with both counts it was alleged that Johnson personally used a firearm (former §§ 12022.5, subd. (a)(1), 12022.53, subd. (b)), and he was charged in a separate count with being a felon in possession of a firearm based on a 2003 conviction for sale or transportation of marijuana. (Health & Saf.Code, § 11360, subd. (a).) Both men were also charged with murder of Bradley, with special circumstance allegations of elimination of a witness, lying in wait, and multiple murders.

Dunn was originally charged as a principal in Bradley's murder, with lying in wait and elimination of a witness alleged as special circumstances. She was charged as an accessory after the fact in the Antioch crimes. She later entered into a plea bargain with the district attorney, as described in footnote 9, *ante*. She decided to cooperate with the prosecution after she saw Bradley's son testify at the preliminary hearing.

The case was tried before a jury beginning February 8, 2010, with testimony taken over 14 days. Edwards presented one defense witness, his sister, who testified that Bradley had been like a "second mom" to him since childhood and they had an affectionate relationship. Johnson presented no evidence. The defendants did not testify.

On March 19, 2010, Johnson and Edwards both were convicted of all charges and all special allegations were found true, but the attempted murder of Denton was found to be without premeditation and deliberation. On June 4, 2010, both defendants were sentenced to life terms without possibility of parole for the murders.

Ans., Ex. 4 (State Appellate Opinion, *People v. Johnson*, No. A128751, 2013 WL 3242191 (Cal. Ct. App. June 27, 2013).

## STANDARD OF REVIEW

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution

or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor,* 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

## DISCUSSION

### I. INSUFFICIENT EVIDENCE

Petitioner asserts that there is insufficient evidence to support conviction for the Antioch murder and attempted murder. Petn. at m-1 to m-6. Specifically, Edwards argues there is insufficient evidence because (1) eyewitnesses of the incident did not identify petitioner; (2) evidence connecting petitioner to the van used in the murder does not show actual involvement in the murder; (3) there were inconsistencies in the witness testimony as to how many people were in the van when the murder occurred; (4) there is insufficient evidence that the cell phone records are associated with the petitioner; and (6) a connection to the van and the apartment complex are insufficient to show petitioner's involvement. Ptn. at m-1 to m-6. Petitioner contends that

because there was insufficient evidence, he is due habeas relief.

Petitioner made the same claim on direct appeal in the state appellate court. The state appellate court rejected his claim, reasoning:

> Although Edwards was not identified by any eyewitness as having been involved in the Antioch crimes, there was circumstantial evidence against him going well beyond the testimony of Dunn, including this: (1) Fritz testified he was involved in Bradley's rental of vans from Fox; (2) Fritz saw Edwards driving one of the rented vans around Oakland; (3) the last van rented for Edwards's use unquestionably was the murder weapon based on matching blood on its underside; (4) Fritz overheard Bell say to someone on the phone that something "went down" in Antioch, inferably having to do with the rented van, and cell phone records support an inference that the person on the line with him was Edwards; (5) cell phone records confirmed that Edwards was in Antioch at the time of the crimes (see fn. 6, *ante* ); (6) cell phone records corroborated Dunn's testimony that she and Edwards both went to Antioch on the night of March 24;[24] (7) Edwards's mother lived in the apartment complex where the crimes occurred; (8) Edwards ran when the police arrived to arrest him and buried his cell phone under the house; and (9) in jail phone conversations Edwards admitted his own participation in the Antioch crimes in coded language (Cancun) and discussed getting rid of the surviving witness. There was more than sufficient corroboration to allow the jury to use accomplice testimony in assessing guilt.
>
> Adding in Dunn's testimony makes the evidence even stronger, as it shows the lengths to which Edwards went in distancing himself from the van. He enlisted Dunn's aid in retrieving it, even though she was an unlicensed driver, and had her return it to Fox and pretend to be Bradley. In addition, Edwards told Dunn the van was "hot," and she heard him describe the Antioch crimes over the phone, including that he had been present at his mother's apartment complex when one "nigga" got shot and one "nigga" got run over.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, *Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, *id.* at 324.

The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas proceedings…." *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam) (finding the

Third Circuit "unduly impinged on the jury's role as factfinder" and failed to apply the deferential standard of *Jackson* when it engaged in "fine-grained factual parsing" to find the evidence was insufficient to support petitioner's conviction). A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992), *cert. denied*, 510 U.S. 843 (1993); *see, e.g.*, *Coleman*, 132 S. Ct. at 2065 ("the only question under Jackson is whether [the jury's finding of guilt] was so insupportable as to fall below the threshold of bare rationality"). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, has there been a due process violation. *Jackson*, 443 U.S. at 324.

Petitioner asks that this court believe his version of events and details why each individual piece of evidence should not be credited and could not, on its own, establish liability for the Antioch crimes. Stated another way, petitioner asserts that the jury should have believed his defense rather than the prosecution's case. This claim is in essence a challenge to the jury's credibility determination in favor of the prosecution's evidence.

"A jury's credibility determinations, [however, are] entitled to near-total deference. *Bruce v. Terhune*, 376 F.3d 950, 957 (9th. Cir. 2004). Indeed, if confronted by a record that supports conflicting inferences, such as the instant case, a federal habeas court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. Viewing petitioner's arguments under this standard, I must defer to the jury's credibility determination in favor of the prosecution's arguments and evidence, and its rejection of petitioner's defense. Based upon an independent review of the record, I conclude that the state court's denial of the claim was not objectively unreasonable and is entitled to AEDPA deference. Viewing this evidence in the light most favorable to the prosecution, a rational trier of fact could find in favor of the prosecution. Accordingly, this claim is DENIED.

## II. UNCORROBORATED TESTIMONY OF THE ACCOMPLICE
### A. Antioch Murder and Attempted Murder

Petitioner further contends that his conviction for the Antioch murder and attempted murder was unlawful under California Penal Code section 1111 because it was based on the uncorroborated testimony of the accomplice, Dunn. The corroboration rule is not required by the Constitution or federal law. *United States v. Necoechea*, 986 F.2d 1273, 1282 (9th Cir. 1993) ("[U]ncorroborated testimony of an accomplice is sufficient to sustain a conviction unless it is incredible or insubstantial on its face."). However, petitioner contends that his due process right to fundamental fairness was violated when the State did not follow its own rules, specifically the corroboration rule of California Penal Code section 1111. Ptn. at m-7 to m-8. "A State violates a criminal defendant's due process right to fundamental fairness if it arbitrarily deprives the defendant of a state law entitlement." *Laboa v. Calderon*, 224 F.3d 972, 979 (9th Cir. 2000). Specifically, petitioner contends his right to fundamental fairness was violated as Dunn's testimony was not sufficiently corroborated.

First, petitioner fails to note that Dunn was not charged as an accomplice for the Antioch murder and therefore the corroboration rule does not necessarily apply to the Antioch crimes. The state appellate court described the application of Section 1111 as follows:

> Turning first to the Antioch crimes, the murder of Lavall and the attempted murder of Denton, the accomplice testimony rule arguably does not apply at all, because Dunn was not charged as a principal in the Antioch crimes, but rather as an accessory after the fact. (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1353; *People v. Daniels* (1991) 52 Cal.3d 815, 867 ["mere accessories are not accomplices under section 1111"]; §§ 31–32.) There was no evidence that Dunn was involved in the Antioch crimes except for her role in returning the van to Oakland.[23]

As the trial court did not conclude that Dunn was an accomplice, as a matter of law, it was up to the jury to assess Dunn's role in these crimes and determine whether the corroboration rule should apply. *People v. Fauber*, 2 Cal. 4th 792, 834 (1992) ("Whether a person is an accomplice is a

15

question of fact for the jury unless there is no dispute as to either the facts or the inferences to be drawn therefrom."). Because I must presume that the jury resolved all fact issues in favor of the prosecution, and I must defer to that judgment, I conclude that the jury determined that Dunn was not an accomplice to the Antioch crimes and the corroboration rule does not apply.

Further, even if the corroboration rule applies, the prosecution presented substantial additional evidence tying Edwards to the Antioch crimes. Edwards argues that Dunn's testimony was uncorroborated because the prosecution did not submit independent evidence supporting "Dunn's story that she and the petitioner picked up the van in Antioch and brought it back to Oakland." However, to satisfy the corroborative evidence rule, the prosecution "need not corroborate every fact to which the accomplice testified." *People v. Fauber*, 2 Cal. 4th at 834. Corroborative evidence is "sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." *Id.* As discussed above, and as the Court of Appeal found, there was significant circumstantial evidence, in addition to Dunn's testimony, connecting Edwards to the Antioch crimes that supported and corroborated her testimony. *See*, *supra* Section 1. California's corroboration rule does not require the prosecution to present specific evidence confirming Dunn's testimony as to the specific events she recounted.

As Dunn was not an accomplice to the Antioch crimes, Section 1111 does not apply to these convictions. Further, Dunn's testimony was not uncorroborated as the prosecution presented substantial circumstantial evidence tying Edwards to the Antioch murder and attempted murder. Petitioner's constitutional right to fundamental fairness was not violated by an unreasonable application of Cal. Penal Code section 1111. Accordingly, Edwards' petition is DENIED on this claim.

### B. Murder of Aberial Bradley

Petitioner argues that his conviction for aiding and abetting the murder of Aberial Bradley

was unlawful under California Penal Code section 1111 because it was based on the uncorroborated testimony of Dunn. Ptn. at m-9. Petitioner contends that his due process right to fundamental fairness was violated when the state did not comply with its corroboration rule. Ptn. m-7 to m-8.

Petitioner argues that corroborating evidence must tend to connect the defendant to the crime itself without aid or assistance from the accomplice's testimony. Ptn. at m-6-m-7. California's corroboration rule requires only that the corroboration "tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." *People v. Fauber*, 2 Cal. 4th 792, 834 (1992). Dunn's testimony was sufficiently corroborated as to satisfy California law. The testimony of Bradley's son partially corroborated the movements of Dunn and Bradley and the use of their cell phones during the drive. RT 798-811. Cell phone records confirm Dunn's testimony as to her movements to and from Pittsburg and the various calls made during that time. *See e.g.*, RT 1911-13. Other records show calls between Edwards and Dunn during Dunn and Bradley's trip to Pittsburg. *See e.g.,* RT 1917.

Moreover, the state appellate court found cell phone records of the petitioner's movements as additional corroboration of Dunn's testimony by reflecting the movements of petitioner and co-defendant, linking defendant to the crime itself:

> Cell phone records further showed that both Edwards and Johnson were where they needed to be to carry out the plot, both when the plan was to lure Bradley to the Seminary gas station, and when the plot finally came to fruition. Lieutenant Medeiros testified on the basis of the cell phone records that the "muddy phone" (Edwards's) connected to a cell tower near the Seminary Avenue gas station at 7:56 p.m., and 40 seconds later Johnson's phone "was hitting the same cell tower...." Those records are sufficient corroboration that Edwards and Johnson were waiting together at or near the gas station for Dunn to deliver Bradley to them.[25]
>
> Edwards's phone was again accessing a cell tower near the 77th Avenue house at 8:16 p.m., and Johnson's was also accessing the same cell tower at 8:28 p.m., again suggesting the two men were traveling together. Both Johnson's and Edwards's cell phones were utilizing the same cell tower near the 77th Avenue house at 8:42 p.m.
>
> And they were on the move. Both Johnson's and Edwards's cell phones were in the vicinity of the killing on Brookdale Avenue when it happened. Bradley accessed the cell tower at 3701 High Street (near Skipper's house) at 9:01 p.m., Edwards accessed it at

> 8:59 p.m. and again at 9:04 p.m., and Johnson accessed it at 9:05 p.m. Thus, the cell phone records corroborated Dunn's testimony about the sequence of events and the phone calls that were exchanged, establishing that Johnson and Edwards had the opportunity to commit the murder.

Ans., Ex. 4 (State Appellate Opinion, *People v. Johnson*, No. A128751, 2013 WL 3242191, at *14-15 (Cal. Ct. App. June 27, 2013).

Petitioner concedes that the prosecution presented evidence corroborating Dunn's testimony, but challenges the weight and adequacy this evidence should be afforded. In effect, petitioner is again challenging the jury's credibility determination that the prosecution's evidence, rather than his defense, should be credited. A jury's credibility determinations are entitled to near-total deference and this court must conclude that the jury's decision to credit the prosecution's evidence did not violate petitioner's right to fundamental fairness. *Jackson*, 443 U.S. at 306. The prosecution presented corroborating evidence of Dunn's testimony and it appears that the jury found this evidence credible. The state court's denial of petitioner's claim is entitled to AEDPA deference. This claim is DENIED.

## CONCLUSION

The Court of Appeal's adjudication of Edwards' claims did not result in decisions that were contrary to, or involved an unreasonable application of, clearly established federal law, nor did they result in decisions that were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, the petition is DENIED.

A certificate of appealability will not issue as reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Edwards may seek a certification of appealability from the Ninth Circuit Court of Appeals.

The clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

Dated: November 22, 2016



WILLIAM H. ORRICK
United States District Judge